**PLYMOUTH FOAM PRODUCTS, INC., Plaintiff,**

v.

**CITY OF BECKER, MINNESOTA, Defendant.**

**Civil No. 4–95–855.**

United States District Court, D. Minnesota, Fourth Division.

Nov. 1, 1996.

David R. Marshall, Terri A. Georgen, Fredrikson & Byron, Minneapolis, MN, for Plymouth Foam Products, Inc.

James J. Thomson, Kennedy & Graven, Minneapolis, MN, Joe Y. Yang, Holmes & Graven, Minneapolis, MN, for City of Becker, Minn.

## ORDER

DOTY, District Judge.

This matter is before the court on the motion of plaintiff Plymouth Foam Products, Inc. ("Plymouth Foam") for partial summary judgment and the cross-motion of defendant City of Becker for summary judgment. Based on a review of the file, record and proceedings herein, and for the reasons stated below, defendant's motion is granted and plaintiff's motion is denied.

## INTRODUCTION

Plymouth Foam is a Wisconsin corporation with its principal place of business in Plymouth, Wisconsin. The company manufactures insulation and foam packaging products. Plymouth Foam is owned by Brad Roberts ("Roberts"), who is Plymouth Foam's Vice President of Operations, and his two brothers. The City of Becker ("City" or "Becker") is municipal corporation located in Sherburne County, Minnesota. David Graning ("Graning") is the City's Community Development Director. The court has jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332.

## BACKGROUND

In 1988, Plymouth Foam leased a building in Maple Grove, Minnesota for its manufacturing operations. The lease on the Maple Grove facility expired on December 31, 1994. Sometime in 1990, Roberts and his brothers began discussing relocating the Maple Grove operation. In January 1992, Roberts visited St. Cloud, Minnesota to determine whether that area would be a suitable relocation site. Through conversations with Bill Fahrney ("Fahrney"), the Development Coordinator for the St. Cloud Area Economic Development Partnership,[1] and Duane Schultz ("Schultz"), of Winkleman Builders, Roberts contacted Graning about relocating Plymouth Foam to Becker.

In the summer of 1992, Roberts learned that Plymouth Foam would have to apply to the Minnesota Pollution Control Agency for a new Area Emissions Permit ("AEP") and would have to complete an environmental assessment worksheet ("EAW"). Plymouth Foam's efforts to relocate to Becker could not go forward until the State of Minnesota issued the AEP and approved the EAW. Consequently, between July 1992 and June 1993, there was little communication between Graning and Roberts.

On July 20, 1993, the city council adopted Resolution 93–59 which approved an economic incentive package for Plymouth Foam which had been proposed by Becker's Economic Development Authority ("EDA"). (Def. Ex. 8). Following the city council's action, Plymouth Foam received a superior offer to relocate from the City of Graettinger, Iowa. By letter dated September 30, 1993, Roberts inquired of Graning whether Becker would be willing or able to match the competing offer.

In response to Roberts' letter, Graning contacted the Minnesota Department of Economic Development ("MDTED") to determine whether any additional financing from the state would be available. He learned that because Plymouth Foam had received an offer to relocate from a city outside of Minnesota, Becker could apply for funding from MDTED. In March 1994, Graning met with Terrell Towers ("Towers"), who was a MDTED staff representative, to discuss the possibility of receiving a grant from the state to help defray the costs Plymouth Foam would incur relocating to Becker. Graning's notes of that meeting indicate that Towers assured him that the project met MDTED's requirements, that the City could apply for

---

[1]. The St. Cloud Area Economic Development Partnership is a partnership of municipalities, Northern States Power and universities in Stearns, Benton and Sherburne Counties. The purpose of the partnership is to retain existing businesses in the area and to recruit new businesses.

financing from the state's Economic Recovery Fund and if the City applied $150,000 would probably be made available. (Def.Ex. 23). Graning informed Roberts of the substance of his meeting with Towers. (Def. Ex. 3 at 110).

On March 23, 1994, Roberts wrote Graning that Plymouth Foam intended to relocate to Becker provided that the City met certain conditions he and Graning had previously discussed. One of the conditions was that the City provide "[a] $150,000 forgivable loan or grant to help offset moving costs and to help train new employees that we will need to hire." (Def.Ex. 10). Roberts also wrote that "[i]f there is anything that you need from me in order to file for the state money, or anything else, please feel free to call me." (*Id.*). Both Graning and Roberts understood that the $150,000 would be coming from MDTED and not the City. (Def. Ex. 1 at 70); (Def.Ex. 3 at 155).

On April 11, 1994, the EDA adopted a motion "to accept the [March 23, 1994] Plymouth Foam Proposal." (Def.Ex. 13). Subsequently, Fahrney submitted a Community Development Application to the MDTED on behalf of Plymouth Foam. (Def. Ex. 12). The city council did not take any action with respect to Roberts' March 23, 1994, proposal, however, and did not offer Plymouth Foam any other incentives to relocate to Becker other than those listed in Resolution 93–59.

In approximately July or August 1994, Graning was informed by the MDTED that the Economic Recovery Fund had been exhausted and that additional funding might become available in January 1995. Graning informed Roberts of this development. Nonetheless, on August 10, 1994, Becker conveyed the property to Plymouth Foam. On August 17, 1994, Plymouth Foam began construction of a 40,000 square foot facility in Becker even though the City had not secured the $150,000 from MDTED.

Prior to the groundbreaking, Becker had resubmitted an application to the MDTED on behalf of Plymouth Foam on August 11, 1994. By letter dated September 28, 1994, MDTED informed Becker that the state would be unable to provide any financing to assist with Plymouth Foam's relocation because the Economic Recovery Fund had been fully allocated for the 1995 fiscal year. (Def.Ex. 17). Plymouth Foam did obtain a $150,000 bank loan in lieu of the forgivable loan or grant it believed Becker was to provide.

On November 16, 1995, Plymouth Foam filed a complaint asserting claims for breach of contract and fraud against the City. Plymouth Foam seeks summary judgment on its breach of contract claim; the City seeks summary judgment on both of Plymouth Foam's claims.

## DISCUSSION

■ The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment as a matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510–11.

■ On a motion for summary judgment, the court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in its favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegation in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather, the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). An issue of material fact is genuine if it has a

real basis in the record. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). If reasonable minds could differ as to the import of the evidence, judgment as a matter of law should not be granted. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511–12. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. With these standards at hand, the court will consider the parties motions.

## I. Breach of Contract

■ Plymouth Foam contends that the City breached the "contract" negotiated between Graning and Roberts by not providing it with a $150,000 forgivable loan or grant. Graning, who was Roberts contact with the City, had no authority to bind the City, however. Moreover, the City never accepted the Plymouth Foam's March 23, 1994, offer. Therefore, no contract was ever formed between the parties.

■ Under Minnesota law, a municipality may enter into a contract only pursuant to authority from the city council. Minn.Stat. Ann. § 412.201 (West 1994). The record contains no evidence that the Becker City Council granted either Graning or the EDA the actual authority to enter into contracts on behalf of the City. Moreover, assuming *arguendo* that Graning had apparent authority to contract on behalf of the City, parties dealing with municipalities cannot rely on an agent's apparent authority.[2] "All persons contracting with a municipal corporation are conclusively presumed to know the extent of the authority possessed by the officers with whom they are dealing." *Jewell Belting Co.*

*v. Village of Bertha,* 91 Minn. 9, 97 N.W. 424, 425 (1903). "[A plaintiff] is required to ascertain whether the [city council] passed a resolution authorizing the [alleged agreement], or act at his peril." *Morris v. Perpich,* 421 N.W.2d 333, 336 (Minn.Ct.App. 1988), *rev. denied* (May 16, 1988). Because the city council did not authorize Graning to accept Plymouth Foam's March 23, 1994, proposal which Roberts contends Graning agreed to, no contract was entered into by the City.

In addition, under § 412.201 every contract entered into by a municipality must be a "written instrument" and must be "executed on behalf of the city by the mayor and clerk, with the corporate seal affixed." Graning testified at his deposition that he recalled that the city council accepted the terms of Roberts' March 23, 1994 letter. (Def.Ex. 3 at 115–16). However, Plymouth Foam has failed to produce any written instrument, including a resolution, executed by anyone on behalf of the City which shows that the city council agreed to provide a $150,000 grant or loan to help defray Plymouth Foam's relocation costs. Indeed, the Mayor of Becker[3] testified in his deposition that the city council never considered, much less approved or accepted the Plymouth Foam's March 23, 1994 proposal. (Def.Ex. 14 at 28–29).

■ Plymouth Foam also claims that the City should be estopped from denying the existence of a contract between the parties and from denying that the City is obligated to provide Plymouth Foam a $150,000 forgivable loan or grant. To establish that the City may be estopped, Plymouth Foam must show the City committed fraud. *Compare REM–Canby v. Department of Human Servs.,* 494 N.W.2d 71, 74 (Minn.Ct.App.

---

2. "Apparent authority is that authority which a principal holds an agent out as possessing, or knowingly permits an agent to assume." *Foley v. Allard,* 427 N.W.2d 647, 652 (Minn.1988). "[T]he proof of the agent's authority must be found in the conduct of the principal, not the agent." *Hockemeyer v. Pooler,* 268 Minn. 551, 130 N.W.2d 367, 375 (1964). There is no evidence that the city council by its conduct authorized Graning to enter into contracts on the City's behalf.

3. The Mayor was designated by the City in response to Plymouth Foam's Rule 30(b)(6) deposition notice requesting that the City designate a person to be "examined on matters relating to the issues discussed by the City of Becker City Council during the period February 1994 through December 1994." (Def.Ex. 26).

1992), *rev. denied* (February 25, 1993) (listing elements of equitable estoppel claim against the government), *with Florenzano v. Olson,* 387 N.W.2d 168, 174 n. 4 (Minn.1986) (listing elements of fraudulent misrepresentation). Estoppel is an equitable doctrine addressed to the court's discretion. The City may be estopped if justice requires, but the Minnesota Supreme Court has stated that estoppel is to be applied sparingly against the government. *Brown v. Minnesota Dept. of Public Welfare,* 368 N.W.2d 906, 910 (Minn.1985); *Mesaba Aviation Div. of Halvorson of Duluth, Inc. v. County of Itasca,* 258 N.W.2d 877, 880 (Minn.1977). A plaintiff seeking to estop a municipality has a heavy burden of proof. *Ridgewood Devel. Co. v. State,* 294 N.W.2d 288, 292 (Minn.1980). To establish a claim of equitable estoppel against the government, a party must prove that: (1) the government made a misrepresentation of a material fact; (2) the government knew the representation was false; (3) the government intended its representation be acted upon; (4) the party claiming estoppel did not know the facts; (5) the party claiming estoppel relied upon the misrepresentation to its detriment; (6) the party claiming estoppel must demonstrate expenditures that are unique to the proposed project and would not be otherwise usable; and (7) the government committed affirmative wrongful conduct, rather than acting inadvertently, imperfectly or by mistake. *REM–Canby,* 494 N.W.2d at 74; *see also Brown,* 368 N.W.2d at 910; *Ridgewood,* 294 N.W.2d at 293. Only if these elements are proved are the equities of the circumstances then examined. *Ridgewood,* 294 N.W.2d at 293.

■ Wrongful conduct on the part of a government official is central to a claim of equitable estoppel. *Id.* There is no evidence that Graning told Roberts that he or any other representative of the City could contract with him without city council approval. Indeed, the resolution establishing the EDA (Def.Ex. 6) and Resolution 93–59 (Def.Ex. 8) put Roberts and Plymouth Foam on notice that the EDA and Graning had no authority to contract on behalf of the City. Moreover, there is no evidence that prior to the time Plymouth Foam relocated to Becker in August 1994 that Graning ever told Rob-

erts that the city council accepted Plymouth Foam's relocation proposal. Thus, Graning's April 1996 deposition testimony that he recalled that the city council approved Roberts' proposal does not establish the City acted wrongfully. Accordingly, the City is not equitably estopped either from asserting that there was no contract between that parties or from asserting that it does not owe Plymouth Foam $150,000.

## II. Fraud

■ To establish a claim of fraud, a plaintiff must show: (1) a false representation of a material past or present fact susceptible of knowledge; (2) the defendant either knew it to be false or asserted it as his own knowledge without knowing whether it was true or false; (3) the defendant intended the plaintiff to act on his representations; (4) the plaintiff was induced to act in reliance on the representation; and (5) the plaintiff suffered damages. *Davis v. Re–Trac Mfg. Corp.,* 276 Minn. 116, 149 N.W.2d 37, 38–39 (1967); *Rognlien v. Carter,* 443 N.W.2d 217, 220 (Minn.Ct.App.1989), *rev. denied* (September 21, 1989).

■ Viewed in the light most favorable to Plymouth Foam, the evidence in this case shows that Graning, in reliance on representations made by Towers, told Roberts either that: (1) if the City applied for financing from the state's Economic Recovery Fund a $150,00 grant would be approved by MDTED; or (2) that MDTED had agreed to provide $150,000 and that these funds would be available upon request. (Def. Exs. 23, 25); (Roberts Aff. at ¶ 10); (Roberts Supp. Aff. at ¶ 3). Even assuming these statements were made by Graning, they do not support a fraud claim because there is no evidence that Graning knew these statements were false when he made them. There is no evidence that Graning knew at the time he made these statements that money from the Economic Recovery Fund was not available, or that funds from the state would not be forthcoming or that the City would refuse to provide Plymouth Foam with any funds received from the MDTED even if they were available. "When a promise is made in good

faith with the expectation of carrying it out, the fact that it is subsequently broken does not give rise to a cause of action for fraud." *Hayes v. Northwood Panelboard Co.,* 415 N.W.2d 687, 690 (Minn.Ct.App.1987), *rev. denied* (January 28, 1988). Graning's representations or statements concerning the $150,000 that the City was to provide Plymouth Foam are insufficient to support a claim fraud because Plymouth Foam has failed to show that either that the City or Graning acted in bad faith or had no intention of complying with representations or statements when they were made. *Id.*

In addition, even if Graning told Roberts that $150,000 would be available to Plymouth Foam upon request, any reliance on this statement was not justifiable. As stated above, parties contracting with municipalities are conclusively presumed to know the extent of the authority of the persons with whom they deal. Graning had no authority, actual or apparent, to approve the terms of a contract with Plymouth Foam on behalf of the City. Only the city council had that authority. Therefore, Plymouth Foam's reliance on Graning's statements would have been justifiable only if the city council had accepted Roberts' March 23, 1994, offer.

## CONCLUSION

There is no genuine issue as to any material fact in this case and the City of Becker is entitled to judgment as a matter of law on both Plymouth Foam's breach of contract claim and fraud claim. Accordingly, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for partial summary judgment is denied;

2. Defendant's motion for summary judgment is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**